J-S44010-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| DAVID SCHOENHOLTZ AND MARYA SHOENHOLTZ | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| HALF MOON LAND COMPANY, LLC | : | |
| | : | No. 242 MDA 2020 |
| Appellant | : | |

Appeal from the Judgment Entered January 6, 2020
In the Court of Common Pleas of Centre County Civil Division at No(s):
2015-1726

BEFORE:  BENDER, P.J.E., NICHOLS, J., and McCAFFERY, J.

MEMORANDUM BY BENDER, P.J.E.:                **FILED DECEMBER 30, 2020**

Half Moon Land Company, LLC ("Half Moon") appeals from the judgment entered on January 6, 2020,[1] in favor of Appellees, David Schoenholtz and Marya Schoenholtz (collectively "the Schoenholtzes"), after the trial court denied the parties' cross motions for post-trial relief.  After careful review, we affirm.

---

[1] Half Moon purports to appeal from the order dated December 11, 2019, denying the parties' cross-motions for post-trial relief; however, an appeal properly lies from the entry of judgment following the trial court's disposition of post-trial motions.  ***See Fanning v. Davne***, 795 A.2d 388 (Pa. Super. 2002).  Although Half Moon erroneously appealed from the order denying post-trial relief, judgment was subsequently entered on January 6, 2020, and its notice of appeal relates forward to that date.  ***See*** Pa.R.A.P. 905(a)(5). Hence, no jurisdictional defects impede our review.

This matter stems from an agreement to purchase land that never came to fruition. The Schoenholtzes initiated a breach of contract and unjust enrichment action against Half Moon on April 27, 2015,[2] in which they sought the return of their $20,400 escrow deposit, plus pre-judgment interest. On October 7, 2016, Half Moon filed an answer with new matter and a counterclaim, also asserting breach of contract and unjust enrichment. The Schoenholtzes filed a reply to Half Moon's new matter and counterclaim, wherein they raised the statute of limitations defense to Half Moon's breach of contract counterclaim.

Testimony was heard at a non-jury trial on April 12, 2019, after which the trial court issued the following findings of fact:

1. [The Schoenholtzes] own several restaurants in Centre County, Pennsylvania[,] and are residents of Half Moon Township, Centre County[,] Pennsylvania.

2. [Half Moon] is a limited liability company organized under the laws of the Commonwealth of Pennsylvania.

3. [Half Moon's] managing member is Mark Maloney, a resident of Centre County, Pennsylvania.

4. [The Schoenholtzes] knew Mr. Maloney as a customer at one of their restaurants and had conversations with him about their desire to purchase land to build a home. Mr. Maloney informed [them] about land he was developing (later referred to as "the Farm") in Half Moon Township. These conversations occurred in early 2011.

5. [The Schoenholtzes] and [Half Moon] initially executed a standard agreement for the sale of vacant land ("Agreement of Sale") on December 14, 2011.

---

[2] The complaint was reinstated by agreement of counsel on June 16, 2016.

6. In the Agreement of Sale, [the Schoenholtzes] agreed to purchase 5.465 acres of land identified as Property Code #17-2-4A (the "Property" or "Lot 3") for $204,000.

7. The Property is located in Half Moon Township, Centre County, Pennsylvania.

8. As consideration for the Agreement of Sale, [the Schoenholtzes] gave [Half Moon] a $20,400 deposit via check on December 14, 2011.

9. [The Schoenholtzes'] deposit was placed into an operating account held by [Half Moon].

10. On December 23, 2011, the parties entered into an Article of Agreement, which supplanted the Agreement of Sale, with a closing date on or before March 15, 2012.

11. The Article of Agreement incorporated the $20,400 deposit previously paid by [the Schoenholtzes], and that deposit served as consideration for the agreement.

12. The parties agree the deposit was to be deposited into an escrow account.

13. Mr. Maloney signed the Article of Agreement as a representative of [Half Moon].

14. Paragraph Four of the Article of Agreement calls for the execution of a special warranty deed to be delivered on the date of possession (listed as December 30, 2011 in Paragraph Two of the Article of Agreement) to Greg Copenhaver, an agent with RE/MAX Centre Realty of State College [("RE/MAX")].

15. Mr. Copenhaver acted as a real estate agent for the sale of many of the lots located on the Farm.

16. Mr. Copenhaver was asked to write the Agreement of Sale for Lot 3 by Mr. Maloney.

17. Mr. Copenhaver did not receive a deed nor did he escrow a deed as was required by Paragraph Four of the Article of Agreement.

18. In February 2012, [the Schoenholtzes] commenced discussions with Mr. Maloney about replotting Lot 3 to possibly extend it to ten (10) acres, with the intention of splitting the lot with their friends[,] the Krauses.

19. The parties never entered into an agreement of sale for the replotted land.

20. Neither party sought to close on Lot 3, pursuant to the Article of Agreement, on March 15, 2012.

21. PennTerra Engineering, Inc. (["]PennTerra["]) was hired by [Half Moon] to replot the lot, and began that process in April 2012.

22. PennTerra worked to replot Lot 3 from April 2012 to January 2013.

23. On February 12, 2013[,] Mr. Maloney sent an email to [the Schoenholtzes] with a letter attached informing them Lot 3, with its new dimensions, was approved for sewage disposal permits to be issued. The letter was sent from Robert W. Everett III, a sewage planning specialist with the Pennsylvania Department of Environmental Protection.

24. In June 2013, [Half Moon] asserts [it] informed [the Schoenholtzes] Lot 3 was replotted. [Mrs.] Schoenholtz testified she and her husband were never informed Lot 3 had officially been replotted.

25. After it was replotted, Lot 3 became a 10.256 acre lot.

26. There is some discrepancy as to the new purchase price of Lot 3. [Mrs.] Schoenholtz testified the Property was to be approximately $320,000[,] which she and her husband were going to split with the Krauses. [Half Moon] avers the agreed upon price was $316,506.74.

27. Sometime in 2013, Mr. Maloney presented [the Schoenholtzes] with a Termination of Article of Agreement to terminate the Article of Agreement entered into by the parties on December 23, 2011.

28. The Termination of Article of Agreement addressed the cost of the replot and how the cost[] would be distributed between the parties.

29. [The Schoenholtzes'] attorney had legal concerns about the terms of the Termination of Article of Agreement and neither [the Schoenholtzes] nor [Half Moon] signed it.

30. On May 30, 2014, … [Mr.] Schoenholtz informed Mr. Maloney, through email, that he and his wife no longer wished to purchase the land, and requested the return of their deposit.

31. In the email[,] … [Mr.] Schoenholtz stated it had been a while since he and his wife had spoken with Mr. Maloney about the [P]roperty.

32. [The Schoenholtzes] hired a realtor in May 2014.

33. [The Schoenholtzes] purchased their current house in July 2014.

Trial Court Opinion ("TCO I"), 8/7/19, at 2-4 (unnecessary capitalization omitted).

On August 7, 2019, the trial court issued an order, finding in favor of the Schoenholtzes on their breach of contract claim and in favor of Half Moon on their unjust enrichment claim. Additionally, the trial court held that Half Moon's counterclaim, to the extent it alleged breach of the Article of Agreement, was time-barred by the statute of limitations,[3] and denied its unjust enrichment counterclaim. However, the trial court found partially in favor of Half Moon to the extent its counterclaim alleged breach of an oral agreement pertaining to the replotting of Lot 3. Accordingly, the trial court awarded the Schoenholtzes their escrow deposit of $20,400.00, plus pre-judgment interest, and awarded Half Moon $8,996.27, representing half of the replotting costs. Both parties filed motions for post-trial relief, which were

---

[3] The statute of limitations on breach of contract actions is four years. Half Moon alleges that the Schoenholtzes breached the Article of Agreement by not closing on the home on December 30, 2011; however, it did not file its amended counterclaim until November 14, 2016. *See* TCO I at 9; 42 Pa.C.S. § 5525.

denied by the trial court on December 11, 2019. On January 6, 2020, judgment was entered in accordance with the August 7, 2019 verdict.

On February 5, 2020, Half Moon filed a timely notice of appeal, followed by a timely, court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Half Moon presents the following issues for our review, which we address out of order for ease of disposition:

1. Whether the trial court erroneously concluded, by employing the wrong legal standard and conclusions that were unsupported by any factual findings, that [Half Moon] failed to establish its right to damages associated with reselling real property after [the Schoenholtzes] agreed, but then refused to purchase that property?

2. Whether the trial court erroneously concluded that unjust enrichment did not apply to the purchase of real property, because [the Schoenholtzes] had not physically taken possession of the property despite having agreed to purchase the property?

3. Whether the trial court erroneously concluded that [the Schoenholtzes] proved their right to the return of a $20,400 agreement of sale deposit, when finding at the same time that [the Schoenholtzes], not [Half Moon], failed to consummate the purchase transaction and thereby breached the agreement[?]

Half Moon's Brief at 6.

To begin, we note our standard of review from the denial of a request for judgment notwithstanding the verdict ("JNOV"):

Appellate review of a denial of JNOV is quite narrow. We may reverse only in the event the trial court abused its discretion or committed an error of law that controlled the outcome of the case. **Hutchinson v. Penske Truck Leasing Co.**, 876 A.2d 978, 984 (Pa. Super. 2005) (citations and quotations omitted). "Abuse of discretion occurs if the trial court renders a judgment that is manifestly unreasonable, arbitrary or capricious; that fails to

- 6 -

apply the law; or that is motivated by partiality, prejudice, bias or ill-will." ***Id.***

> When reviewing an appeal from the denial of a request for JNOV, the appellate court must view the evidence in the light most favorable to the verdict-winner and give him or her the benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences…. Thus, the grant of [JNOV] should only be entered in a clear case and any doubts must be resolved in favor of the verdict-winner. Furthermore, it is only when either the movant is entitled to judgment as a matter of law or the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant that an appellate court may vacate a jury's finding.

***Hutchison ex rel. Hutchison v. Luddy***, 896 A.2d 1260, 1265 (Pa. Super. 2006) (citations and quotations omitted).

***Empire Trucking Co., Inc. v. Reading Anthracite Coal Co.***, 71 A.3d 923, 932 (Pa. Super. 2013) (quoting ***Thomas Jefferson Univ. v. Wapner***, 903 A.2d 565, 569 (Pa. Super. 2006) (internal brackets omitted)).

Here, Half Moon argues that he is entitled to JNOV, as the trial court erred in finding in favor of the Schoenholtzes on their breach of contract claim and in awarding them the return of their $20,400 deposit, plus interest. Half Moon's Brief at 17-18. Half Moon denies the Schoenholtzes' assertion that it refused to convey the Property to them, in violation of the terms of the Article of Agreement. To the contrary, Half Moon asserts that the parties agreed to replot Lot 3, which amounted to an oral modification of the original contract, and that it held the Property for the Schoenholtzes, as required by the Article of Agreement, between the time the contract was executed in December of 2011, and May 30, 2014, when the Schoenholtzes "reneged on this

transaction." **Id.** at 34. Half Moon avers that it rightfully withheld the Schoenholtzes' deposit "when [they] failed to consummate the transaction." **Id.** at 32. Additionally, Half Moon argues that the Schoenholtzes breached an oral contract to purchase the reconfigured Lot 3, and it seeks recovery for the lost value associated with the subsequent sale of the land.[4]

At the crux of Half Moon's claims is its assertion that the trial court erred in finding that the original Article of Agreement was "terminated by the parties[,]" and in determining that no valid, oral agreement for the purchase of the replotted land existed. **See** TCO I at 9, 11. Half Moon argues that the trial court applied the wrong standard in reaching its decision. Rather than examining the record for the establishment of an independent, oral agreement to purchase real estate, it claims that the trial court should have considered the parties' actions to be a mere modification of an existing, written agreement. Half Moon's Brief at 16-18. Half Moon notes that this distinction is relevant because "the standard for establishing an oral modification to a preexisting, written agreement is different than the standard for establishing a standalone oral agreement for the purchase of real property." **Id.** at 20.

---

[4] Half Moon avers that the parties had agreed that the Schoenholtzes would purchase the replotted Lot 3 for $316,506.74, but that after they reneged on the arrangement, it was only able to sell the property for $270,000. Excluding carrying costs, Half Moon alleges that it lost $71,506.74 as a result of the Schoenholtzes' opting to not purchase the Property. **Id.** at 14-15.

Subject to limited exception, the statute of frauds prohibits the enforcement of an oral agreement for the sale of real property. *Id.* (citing 33 P.S. § 1).[5] Whereas, Half Moon suggests that an oral *modification* to a written real estate agreement "may be shown by writings or by words or by conduct or by all three." *Id.* (quoting **Bonczek v. Pascoe Equipment Co.**, 450 A.2d 75, 77 (Pa. Super. 1982) (internal citations omitted)).[6] Half Moon further avers that "[a]n agreement may be modified with the assent of both contracting parties if the modification is supported by consideration." *Id.* at

_____

[5] Our Supreme Court recognized an exception to the statute of frauds in **Kurland v. Stolker**, 533 A.2d 1370 (Pa. 1987), where it held that a party may enforce an oral agreement for the purchase of real property by establishing the following:

> The terms of the contract must be shown by full, complete, and satisfactory proof. The evidence must define the boundaries and indicate the quantity of the land. It must fix the amount of the consideration. It must establish the fact that possession was taken in pursuance of the contract, and, at or immediately after the time it was made, the fact that the change of possession was notorious, and the fact that it has been exclusive, continuous and maintained. And it must show performance or part performance by the vendee which could not be compensated in damages, and such as would make rescission inequitable and unjust.

*Id.* at 1373 (citations omitted). A claimant seeking to prove the existence of such an agreement has the burden of presenting "full, complete, satisfactory and indubitable proof." *Id.* "The 'indubitable proof' a claimant is required to proffer is evidence that should not only be found credible, but of such weight and directness as to make out the facts alleged beyond a doubt." *Id.* (internal citation omitted).

[6] Half Moon's reliance on **Bonczek** is misplaced, as **Bonczek** involves a contract for a lease agreement, not a contract for the purchase of real estate.

19 (quoting ***Wilcox v. Regester***, 207 A.2d 817, 821 (Pa. 1965) (citing ***Pellegrene v. Luter***, 169 A.2d 298, 299 (Pa. 1961); ***Stoner v. Sley System Garages***, 46 A.2d 172, 173 (Pa. 1946)))).[7]

Preliminarily, we must address a fundamental flaw in Half Moon's argument. The law is clear that "when a contract is required by the statute of frauds to be in writing[,] its terms cannot be orally modified[.]" ***Brown v. Aiken***, 198 A. 441, 447 (Pa. 1938). "The modification of a contract is subject to the same test to determine validity as is the original contract." ***Id.*** at 448 (citing Williston on Contracts, 1936, vol. 2, p. 1709, § 594). Our Supreme Court further explained that "where a written agreement is varied by oral testimony, the whole contract in legal contemplation becomes parol." ***Id.*** at 447. Thus, when a party to a written agreement for the sale of land converts the writing into an oral agreement, the statute of fraud declares it to be void. ***Id.*** "The statute is not a mere rule of evidence but a limitation of judicial authority to afford a remedy." ***Id.***

We have recognized an exception to the rule that parties generally may not alter by parol the terms of an agreement required by the statute to be in

---

[7] Again, the cases cited by Half Moon are distinguishable, as none of them arises from contracts for the purchase of real estate. ***See*** Half Moon's Brief at 19 (citing ***Wilcox***, 207 A.2d at 821 (involving an agreement to sell a liquor license); ***Pellegrene***, 169 A.2d at 299 (arising from an oral contract for the construction of a house); ***Stoner***, 46 A.2d at 173 (based on a written lease agreement)). Moreover, Half Moon fails to mention the requirement that the oral agreement must be proven "by evidence which is clear, precise and convincing," ***Pellegrene***, 169 A.2d at 299, nor does it state the exception to the allowance of an oral modification where the modification conflicts with the law or public policy. ***Id.*** at 299 n.2.

writing.  ***Hostetter v. Hoover***, 547 A.2d 1247, 1250 (Pa. Super. 1988) (citing

***Brown***, 198 A. at 441).

> [O]ral modifications of a contract required by the statute of frauds
> to be in writing[,] which relate to the manner of performance[,]
> do not change the character of the written agreement and are
> enforceable.  Thus, a modification as to the time of settlement for
> a contract for the sale of real estate does not result in a new and
> substituted agreement and does not reduce the written contract
> to one in parol.

***Id.*** (internal quotation marks and citation omitted).  This exception is not

applicable in the instant matter, however, as the alleged modifications affect

much more than the manner of performance, *i.e.*, the closing date.  Here, Half

Moon alleges modification of fundamental terms of the Article of Agreement,

such as the size, location, and description of the land itself, as well as the

purchase price, all of which clearly relate to the character of the agreement.

Based on the foregoing, we uphold the trial court's determination that the

original Article of Agreement was not orally modified by the parties.

Having determined that the parties' discussions regarding the replotting

of Lot 3 did not constitute a valid modification of the original contract, we

discern that the trial court properly reviewed the parties' negotiations to

determine whether a separate, valid, oral contract was entered into for the

purchase of the reconfigured Lot 3.  The trial court opined:

> In order for a party to succeed on a breach of contract claim,
> a contract must exist, there must have been a breach of the
> contract, and the breach must have resulted in damages.  ***412
> North Front Street Associates, LP***[ ***v. Spector Gadon &
> Rosen, P.C.***, 151 A.3d 646, 657 (Pa. Super. 2016)].  "Where the
> existence of an informal contract is alleged, 'it is essential to the
> enforcement of such an informal contract that the minds of the

parties should meet on all the terms as well as the subject matter. If anything is left open for future [negotiation], the informal paper cannot form the basis of a binding contract.'" ***GMH Associates, Inc.***[ ***v. Prudential Realty Group***], 752 A.2d [889,] 900 [(Pa. Super. 2000)] (quoting ***Isenbergh v. Fleisher***, 145 A.3d [903,] 907 [(Pa. Super. 1958)]). The first element of a general contract is the existence of an offer or promise that is definite and certain in its terms. ***GMH Associates, Inc.***, ***supra*** at 899. A valid contract for the sale of land must also include the name of the parties, the property, and the consideration or purchase price. [***Id.***] Generally, a contract for the sale of land must be in writing to satisfy the [s]tatute of [f]rauds. ***Firetree, Ltd. v. Department of General Services***, 978 A.2d 1067, 1074 (Pa. [Cmwlth]. Ct. 2009). Our Supreme Court has acknowledged an oral contract for the sale of land under certain circumstances…. [***See Kurland***, 533 A.3d at 1370.]

Here, [the Shoenholtzes] approached Mr. Maloney regarding replotting Lot 3 approximately one month before the closing date within the Article of Agreement. Before the discussion to reconfigure the Lot, [the Schoenholtzes] were working with First National Bank to finalize the details to close on the Property. There was not a signed agreement for the sale of the newly replotted Lot 3, but [the Schoenholtzes] submitted into evidence a Termination of Article of Agreement from 2013[,] which documented the newly defined acreage of Lot 3 and how the replotting costs would be split. This agreement was prepared by [Half Moon's] legal counsel but was never signed by the parties due to concerns [the Schoenholtzes'] attorney had with the contract terms. Despite [the Shoenholtzes'] definite offer to have Lot 3 replotted, and [Half Moon's] acceptance of that offer through performance, there was not definitive evidence submitted to this [c]ourt that indicates the amount of consideration and the purchase price of the land were fixed by the parties.

[Mrs.] Schoenholtz testified at trial that she discussed splitting an approximately $320,000 purchase price for Lot 3 with [their friends,] the Krauses. [Half Moon] avers the purchase price of the land was approximately $316,000. The Termination of Article of Agreement did not list a proposed price for the land. The purchase price is an essential element to a contract for the sale of real property. ***GMH Associates, Inc.***, ***supra***. Because the record reflects the parties were still negotiating the price of the Property, this [c]ourt finds a valid oral contract for the sale of the reconfigured Lot 3 did not exist between the parties. Thus, [Half

Moon's] claim for lost value on the property must fail as it relied on the validity of the oral contract and was calculated based on a proposed purchase price and not a finalized purchase price for the sale of the Property.

TCO I at 10-11.

Half Moon objects to the trial court's finding that the parties were still in the process of negotiating a price for the purchase of replotted Lot 3. In fact, Half Moon suggests that "[n]o portion of the record … even arguably supports that conclusion." Half Moon's Brief at 24. Rather, Half Moon avers that the record reflects a clear meeting of the minds regarding purchase price. *Id.* at 25-26. In response to Half Moon's argument, the trial court clarified its decision:

[The Schoenholtzes] admitted two unsigned agreements. The []Termination of Article of Agreement[] ("Termination Agreement") was to end [the Schoenholtzes'] association with [Half Moon] and provided that [their] $20,400 deposit was to be transferred, in escrow, to Green Acres One, LLC ("Green Acres"). Green Acres is a company owned by [Mr.] Maloney's … father, mother, and acquaintance, Myles Diamond. An [a]rticle of [a]greement between Green Acres and [the Schoenholtzes (the "Green Acres Agreement")] was drafted for the newly replotted land. The [Green Acres] Agreement set the purchase price of the land at $321,297…. On cross-examination, [Half Moon's] counsel … asked [Mrs.] Schoenholtz if she agreed there was a purchase discussed between her and Mr. Maloney about the new replotted lot. [She] asked if [he] was asking about the purchase price of the replot. [He] … replied, "Yes." [Mrs.] Schoenholtz replied that the purchase price was arrived at between [herself and her husband,] … and the Krauses…. [She] then reiterated that was how the purchase price was established for the replot. [Counsel] then asked [Mrs.] Schoenholtz what the purchase price of the replotted lot was going to be. [Mrs.] Schoenholtz replied she believed it was around $320,000. It was from this exchange that the [c]ourt reached the conclusion that the parties had not agreed upon the final price of the Property.

The [c]ourt stands on its decision and analysis…. Upon review of the record, [Mrs.] Schoenholtz was likely referring to the unsigned [Green Acres] Agreement … when she testified that the purchase price of the Property was to be approximately $320,000. [Half Moon] avers the purchase price was approximately $316,506.74, but Mr. Maloney was the only party to testify as to this amount, and [Half Moon] did not present any other evidence as to this agreement. Further, there is nearly a $4,000 difference between the purchase price each party testified to, and this [c]ourt will not entertain [Half Moon's] argument that [Mrs. Schoenholtz] simply rounded up when she put forward the $320,000 figure.

Trial Court Opinion ("TCO II"), 12/11/19, at 2-3 (footnotes omitted).

Despite Half Moon's claims, we agree with the trial court that the evidence presented does not meet the strict burden of proof established in **Kurland**, in order to constitute an enforceable, oral contract for the purchase of replotted Lot 3. **See Kurland**, 522 A.2d at 1373 (requiring "indubitable proof" of all elements of a contract, which should "not only be found credible, but of such weight and directness as to make out the facts alleged beyond a doubt"). Thus, we discern no error of law or abuse of discretion by the trial court in its finding that the parties were still negotiating a purchase price. Moreover, we note that the **Kurland** Court also dictated that, in order to meet the exception to the statute of frauds, the party alleging a valid, oral contract "must establish the fact that possession was taken in pursuance of the contract, and at or immediately after the time it was made, the fact that the change of possession was notorious, and the fact that it has been exclusive, continuous and maintained." **Id.** The Schoenholtzes never took possession of the Property in this matter; thus, Half Moon's claim also fails on this basis.

- 14 -

Next, we consider whether Half Moon should have been granted JNOV on the Schoenholtzes' breach of contract claim. In order to establish a breach of contract, the Schoenholtzes must prove: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." **McCausland v. Wagner**, 78 A.3d 1093, 1101 (Pa. Super. 2013) (quoting **Hart v. Arnold**, 884 A.2d 316, 332 (Pa. Super. 2005)).

Instantly, the trial court observed that there has never been a question, regarding the existence of the contract, and that the contract is not ambiguous. TCO I at 6.[8] Instead of proceeding with an assessment, however,

_____

[8] The trial court explained:

> The parties originally entered into the Agreement of Sale on December 14, 2011, at which time [the Schoenholtzes] presented to [Half Moon] a check for $20,400[,] as a deposit and consideration. On December 23, 2011, the parties signed the Article of Agreement[, which supplanted the Agreement of Sale]. The Article of Agreement listed all essential terms to make the contract enforceable, including the names of the parties, the property to be sold, and the purchase price…. The Article of Agreement also incorporated the $20,400 deposit [the Schoenholtzes] previously paid to [Half Moon] as consideration for the contract. To date, the parties never entered into another written agreement for the sale of the Property.

**Id.** (citing **GMH Associates, Inc.**, 752 A.2d at 900 ("The essential terms that must be identified and agreed to in order to form a valid contract for the sale of real estate are the naming of the specific parties, property and consideration or purchase price.") (citing **Detwiler v. Capone**, 55 A.2d 380, 385 (Pa. 1947)).

- 15 -

as to whether the Schoenholtzes established a breach of the Article of Agreement and resulting damages, the trial court abandoned its breach of contract analysis and, instead, determined that the parties mutually rescinded the contract. *See id.* at 6-7. The trial court concluded on that basis that Half Moon must return the Schoenholtzes' deposit. *Id.* at 8. By awarding the Schoenholtzes the return of their deposit, plus interest, we discern that the trial court was attempting to return the parties to their status quo by applying the equitable remedy of restitution.[9]

"The parties to an agreement may always rescind or abandon it." *Kirk v. Brentwood Manor Homes, Inc.*, 159 A.2d 48, 50 (Pa. Super. 1960) (citation omitted).[10] The law is clear, however, that "[i]n a breach of contract

---

[9] It is well-established:

> Rescission is an equitable remedy, to be granted only where the parties to a contract can be placed in their former positions with regard to the subject matter of the contract. *Sullivan v. Allegheny Ford Truck Sales, Inc.*, … 423 A.2d 1292 ([Pa. Super.] 1980). It is well known that the purpose of equitable rescission is to return the parties as nearly as possible to their original positions where warranted by the circumstances of the transaction. *Gilmore v. Northeast Dodge Co., Inc.*, … 420 A.2d 504, 507 ([Pa. Super.] 1980), citing *Fichera v. Gording*, … 227 A.2d 642 ([Pa.] 1967)….

> Therefore, restitution often goes with rescission, and should not be characterized as damages….

*Baker v. Cambridge Chase, Inc.*, 725 A.2d 757, 766 (Pa. Super. 1999) (emphasis omitted).

[10] As we explained in *Kirk*:

suit, the plaintiff *either* may rescind the contract and seek restitution *or* enforce the contract and recover damages based on expectation." *McCausland*, 78 A.3d at 1102 (emphasis added) (explaining that "[i]n such a case, the inconsistent nature of those actions is obvious—one cannot attempt to terminate his contractual obligations and, at the same time, seek to enforce the contract and enjoy its full benefits in an action for breach").

Here, the Schoenholtzes elected to bring a breach of contract claim against Half Moon; thus, the trial court erred in failing to conduct a proper breach of contract analysis. Moreover, the trial court raised *sua sponte* the issue of whether the parties had rescinded the Article of Agreement, which it cannot do. *See Hertzberg v. Zoning Bd. Of Adjustment of City of Pittsburgh*, 721 A.2d 43, 46 n.6 (Pa. 1998) (indicating that a trial court cannot raise an issue *sua sponte* that does not invoke its subject-matter jurisdiction). Likewise, this Court may not *sua sponte* address an issue that was not raised and preserved by the parties. *Steiner v. Markel*, 968 A.2d 1253, 1256 (Pa. 2009). "*Sua sponte* consideration of issues deprives counsel

---

A contract in writing for the purchase of land may be rescinded by parol, or by such conduct of the parties as clearly shows an intention to rescind. The agreement to rescind a written contract need not be expressed in words, but may be inferred from the acts and declarations of the parties. All that is necessary is a mutual agreement. Whether or not the parties have so agreed is a question of intention, and the existence of such intention is ordinarily an issue for the jury.

*Id.* at 50-51 (internal citations omitted).

- 17 -

of the opportunity to brief and argue the issues and the court of the benefit of counsel's advocacy." ***Wiegand v. Wiegand***, 337 A.2d 256, 257 (Pa. 1975).

Half Moon's assertion that it is entitled to JNOV on the Schoenholtzes' breach of contract claim requires this Court to interpret the terms of the Article of Agreement. We note that the interpretation of the terms of a contract is a question of law for which our standard of review is de novo and our scope of review is plenary. ***McMullen v. Kutz***, 985 A.2d 769, 773 (Pa. 2009). It is also well-established that in interpreting an agreement, we must ascertain the intent of the parties.

> In cases of a written contract, the intent of the parties is the writing itself. If left undefined, the words of a contract are to be given their ordinary meaning. When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. When, however, an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity…. While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact.

***Kripp v. Kripp***, 849 A.29 1159, 1163 (Pa. 2004).

Here, the Schoenholtzes contend that Half Moon breached the Article of Agreement by failing to deliver a special warranty deed to the RE/MAX agent, Mr. Copenhaver, and by failing to escrow the deed,[11] as required by Paragraph

---

[11] "[A]n escrow is a deed delivered to a stranger, to be by him delivered to the grantee upon the happening of certain conditions, upon which last delivery the transmission of title is complete." ***Weisenberger v. Huebrier***, 107 A. 763, 764 (Pa. 1919) (internal quotation marks and citation omitted).

4 of the Article of Agreement.[12]  TCO I at 5-6. Based on our review of the terms of the Article of Agreement, it is clear that the parties intended for Half Moon to deliver to Mr. Copenhaver a special warranty deed on or before December 30, 2011,[13] to be placed in escrow until the purchase price was paid in full by the Schoenholtzes, at which time the deed would be delivered to the Schoenholtzes.  The record indicates that no such deed was ever prepared and placed in escrow.[14]  Moreover, we deem that the Schoenholtzes were

_____

[12] Paragraph 4 provides:

> Deeds, Transfer Taxes:  Seller shall execute a Deed containing the usual covenants of special warranty, with a blank grantee clause, and shall deliver the same on the date of possession to Greg Copenhaver of [RE/MAX], who shall escrow the Deed until such time as the purchase price set forth in Paragraph 3 has been fully paid, at which time he shall deliver said Deed to Buyer.  Upon the delivery of the Deed, Seller and Buyer shall equally divide the applicable realty transfer taxes.

Complaint, Exhibit "B" at 2 ¶4.  The "date of possession" is defined in the Article of Agreement as "at closing on or before Dec[ember 30], 2011[.]" ***Id.*** at 1 ¶ 2.

[13] "[I]n law and equity, in contracts for the sale of real property, time is not of the essence unless it is expressly stipulated, or necessarily implied from the language of the contract or clear action of the parties." ***Tanenbaum v. Sears, Roebuck and Co.***, 401 A.2d 809, 814 (Pa. Super. 1979).  Here, the Article of Agreement expressly provides:  "Time is of the essence…." Complaint, Exhibit "B" at 4 ¶ 16.  Although parties may waive a stipulation that time is of the essence, ***see Cohn v. Weiss***, 51 A.2d 740, 742 (Pa. 1947), Half Moon has waived any such defense in this matter.  ***See*** Pa.R.A.P. 302(a) (stating "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal").

[14] "Mr. Copenhaver did not receive a deed nor did he escrow a deed as was required by Paragraph Four of the Article of Agreement."  TCO I at 3 ¶ 17.

entitled to see the deed before making any further payments. Our Supreme Court has established that before a buyer is obligated to pay money under an agreement to purchase real estate, he is "entitled to see that the conveyance was properly signed, sealed, and acknowledged, and that the description of the land to be conveyed was correct." **Cohn v. Weiss**, 51 A.2d 740, 743 (Pa. 1947) (quoting **Lefferts v. Dolton**, 66 A. 527 (Pa. 1907)).[15] Thus, we determine as a matter of law that the Schoenholtzes have met their burden of establishing a breach of the Article of Agreement on the part of Half Moon. **See McCausland**, 78 A.3d at 1101 ("When performance of a duty under a contract is due, any nonperformance is a breach.").

Our Commonwealth's Supreme Court set forth the following general rule regarding the damages available to the vendee when the vendor breaches a contract for the sale of real estate:

> A vendee in a contract for the sale of land may recover as damages the loss of his bargain if his contract is in writing and the vendor in bad faith refuses to convey, or if the contract is in parol and it was obtained by fraud. In all other cases of contracts for sale of land, whether written or parol, *vendees are limited to the money paid, with interest and expenses*.

**Seidlek v. Bradley**, 142 A. 914, 916 (Pa. 1928) (emphasis added). **See also**

**Empire Properties, Inc. v. Equireal, Inc.**, 674 A.2d 297 (Pa. Super. 1996)

---

Moreover, the record is devoid of any evidence of a special warranty deed for Lot 3 prepared or tendered by Half Moon.

[15] "[T]o constitute a valid tender, a duly executed deed must be produced by the vendor to the vendee, so that the vendee may see that it is regular in form, and that it conveys the estate he bargained for." **Lefferts**, 66 A.2d at 527.

(providing that, absent bad faith on the part of the vendor, a purchaser's right of recovery for the breach of a contract to convey land is limited to a return of the purchaser's down payment and such other reasonable expenditures as the purchaser has incurred); 25 Williston on Contracts § 66:81 (4th ed.) (May 2020) ("A purchaser who is not in default under a contract for the sale of real estate has a cause of action for damages where the vendor wrongfully fails or refuses to convey in accordance with the terms of the contract, such as where the vendor fails to convey at the time stipulated in the contract….").

As there is no assertion of bad faith on the part of Half Moon in the instant matter and the Schoenholtzes are not in default under the contract,[16]

_____

[16] As explained by the trial court:

> Paragraph 10 of the Article of Agreement … outlines the actions to be taken by the Seller ([Half Moon]), including a forfeit of the deposit, in the event of [the Schoenholtz's] default. The Article of Agreement states[,] "If Buyer fails to perform any of his obligations under the terms of this Agreement, which failure shall continue for a period of thirty (30) days *after written notice of such failure to perform has been given to Buyer by Seller*, Buyer shall be in default hereunder." The Article of Agreement states further, " … in the event of default by the Buyer, the said payment may be retained by the Seller (1) on account of the purchase price, or (2) as monies to be applied to the Seller's damages, or (3) as liquidated damages…."

TCO I at 7 (emphasis added; citations to record omitted). We reject Half Moon's suggestion that it did exercise its rights by withholding the deposit, *see* Half Moon's Brief at 33 (reasoning that the Article of Agreement states "in the event of default by the Buyer, … payment may be retained by the Seller…"), as Paragraph 10 clearly provides that Half Moon must provide written notice of a failure to perform and an opportunity to cure before the

it is clear that the damages available to the Schoenholtzes are limited to the amount of their down payment, plus interest and expenses. Thus, we deem the trial court's award of damages in favor of the Schoenholtzes in the amount of $20,400, plus interest from May 30, 2014, the date on which they first requested the return of their deposit, to be appropriate.[17]

Finally, Half Moon claims that the Schoenholtzes were unjustly enriched by the replotting services performed at their request. Although the Schoenholtzes voluntarily chose not to proceed with the purchase of the replotted Property, Half Moon avers that they still received the benefit of the time, energy, and money put into the process of reconfiguring Lot 3. Half Moon's Brief at 31. It argues that the trial court erred in failing to find unjust enrichment in this matter and in declining "to find Mr. and Mrs. Schoenholtz in any way responsible for the lost value associated with the [P]roperty…." *Id.* at 26. In support of its argument, Half Moon insists that the trial court's reading of unjust enrichment is "overly restrictive, and it rests on an erroneous conflation of the services provided—replotting—with the outcome of those services—the replotted parcel." *Id.* at 27. We deem this claim to be meritless.

_____

Schoenholtzes can be declared in default. The record is devoid of any such written notice.

[17] We recognize that the trial court reached its award based on a theory of rescission rather than breach of contract. Notwithstanding, "[t]his Court is not bound by the rationale of the trial court, and we may affirm the trial court on any basis." *Commonwealth v. Williams*, 73 A.3d 609, 620 n.4 (Pa. Super. 2013). *See also Lilliquist v. Copes-Vulcan, Inc.*, 1233, 1235 (Pa. Super. 2011) (stating that an appellate court may affirm a trial court's decision on any grounds supported by the record on appeal).

Unjust enrichment, a remedy in equity, is "the retention of a benefit conferred by another, without offering compensation, in circumstances where compensation is reasonably expected, and for which the beneficiary must make restitution." ***Commonwealth by Shapiro v. Golden Gate National Senior Care LLC***, 194 A.3d 1010, 1034 (Pa. 2018) (quoting ***Roethlein v. Portnoff Law Associates, Ltd.***, 81 A.3d 816, 825 n.8 (Pa. 2013)). ***See also Telwell Inc. v. Grandbridge Real Estate Capital, LLC***, 143 A.3d 421, 428 (Pa. Super. 2016) (recognizing unjust enrichment as an equitable doctrine that imposes a duty in the absence of an agreement when one party has been unjustly enriched at the expense of the other party). A party is precluded from recovering under an unjust enrichment claim where a written or express contract exists. ***Mitchell v. Moore***, 729 A.2d 1200, 1203 (Pa. Super. 1999). A party may recover for any work performed outside the scope of a contract or promise. ***Ruthrauff, Inc. v. Ravin, Inc.***, 914 A.2d 880, 893 (Pa. Super. 2006).

Instantly, the trial court rejected Half Moon's unjust enrichment claim based on the following findings: "[T]he Property was never conveyed to [the Schoenholtzes], nor were they involved in the subsequent sale of the Property. No benefit was conferred on [the Schoenholtzes] after Lot 3 was replotted for which [they] would have been expected to provide compensation." TCO I at 12. The trial court further justified its holding in its opinion regarding the denial of post-trial relief:

"The elements of unjust enrichment are benefits conferred on [the] defendant by [the] plaintiff, appreciation of such benefits by [the] defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for [the] defendant to retain the benefit without payment of value." ***Lackner v. Glosser***, … 892 A.2d 21, 34 [(Pa. Super. 2006)] (quoting ***AmeriPro Search, Inc. v. Fleming Steel Company***, … 787 A.2d 988, 991 [(Pa. Super. 2001)]). [Half Moon] argues that by replotting the Property at [the Schoenholtzes'] request, [Mr. and Mrs. Schoenholtz] were unjustly enriched. The [c]ourt agrees … that [the Schoenholtzes] asked for the Property to be replotted. Even if the [c]ourt amended its decision by finding the replot, itself, was a benefit conferred on [Mr. and Mrs. Schoenholtz], [Half Moon's] unjust enrichment claim would still fail because there was no appreciation of the benefit, and the benefit of the replot was neither retained nor accepted by [the Schoenholtzes] such that the [c]ourt would be justified in ordering [them] to pay the damages [Half Moon] requests.

TCO II at 5-6. We discern no abuse of discretion or error of law by the trial court in denying Half Moon JNOV on its unjust enrichment claim. Moreover, we note that contrary to Half Moon's assertion that the trial court failed to hold the Schoenholtzes responsible in any way for the loss it incurred regarding the reconfiguration of the Property, the trial court did find that the parties entered an oral agreement to replot Lot 3 and that the Schoenholtzes breached that agreement on May 30, 2014. ***See*** TCO I at 11.[18] Accordingly,

_____

[18] The trial court opined:

[Half Moon] acted in accordance with [the Schoenholtzes'] request to replot Lot 3. The record does not reflect that at any time before May 30, 2014[,] [the Schoenholtzes] indicated their unwillingness to proceed with the purchase of the replotted land. The record reflects the parties were kept abreast, periodically, regarding the replotting process[,] which was finished in April 2013, and [the Schoenholtzes] were allegedly notified the replotting was finished

- 24 -

the trial court found Half Moon entitled to half of the replotting expenses incurred. *Id.* at 12.

Based on the foregoing, we affirm the judgment entered in favor of the Schoenholtzes on January 6, 2020.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/30/2020

_____

in June 2013…. Despite the periodic updates from Mr. Maloney regarding the replotting of Lot 3, [the Schoeholtzes] did not, with words or actions, express their wish to not continue with the replotting of the land. In fact the Termination of Article of Agreement[,] admitted into evidence as [the Schoenholtzes'] Exhibit "P[,]" shows [they] were aware of the replotting costs in 2013[,] … [and] that [they] knew the replotting was occurring at their own behest[].

*Id.* at 11-12.